**CARDEN LIVESAY**
———— LTD ————
ATTORNEYS AT LAW

Joshua W. Carden, SBN 021698
419 East Juanita Avenue, Suite 103
Mesa, AZ 85204
joshua@cardenlivesay.com
T. (480) 345-9500
F. (480) 345-6559
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ian Gage,<br><br>                    Plaintiff,<br><br>v.<br><br>Arizona Board of Regents, a political subdivision of the State of Arizona, Dr. Titilayo Ilori and Rachele Peterson, in their official and individual capacities,<br><br>                    Defendants. | **ORIGINAL COMPLAINT**<br><br>**(JURY TRIAL REQUESTED)** |

Plaintiff Ian Gage, by and through undersigned counsel, seeks relief in this Original Complaint against Defendants as follows:

## INTRODUCTION

1. This case involves a University of Arizona research employee who was treated disparately and with hostility because of gender (including his pay) and disability and for speaking out on issues of public concern, and denied FMLA leave and other accommodations to which he was entitled. He also experienced retaliation when he reported these things.

## PARTIES

2. Plaintiff Ian Gage is a resident of Maricopa County, Arizona, and, at all relevant times in this Complaint, an "employee" of ABOR within the meaning of the relevant statutes cited herein.



1

3. Defendant Arizona Board of Regents ("ABOR") is a political subdivision of the State of Arizona, capable of being sued under the statutes identified herein. All acts alleged in this Complaint occurred in Maricopa County, Arizona.

4. Defendant ABOR was an "employer" of Plaintiff within the meaning of the Equal Pay Act, 29 U.S.C. § 208, et seq., Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601, *et seq.*, the Americans With Disabilities Act ("ADA"), 42 U.S.C § 12101, *et. seq.,* and Title VII, 42 U.S.C. § 2000e, *et seq.* at all times material to this action.

5. ABOR, at all times material hereto, upon information and belief employed over 500 persons.

6. Defendant Dr. Titilayo Ilori was at all material times a resident of Maricopa County, Arizona, a Medical Director for Defendant ABOR, and an "employer" of Plaintiff within the meaning of the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601, *et seq.* and for purposes of the Section 1983 claim.

7. Defendant Rachele Peterson was at all material times a resident of Maricopa County, Arizona, an Executive Director for Defendant ABOR, and an "employer" of Plaintiff within the meaning of the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601, *et seq.* and for purposes of the Section 1983 claim.

8. At all times pertinent to this Complaint, ABOR's management officials were acting within the course and scope of their employment with ABOR; and as a result thereof, Defendant ABOR is responsible and liability is imputed for the acts and omissions of its management officials, as alleged herein, under the principle of *respondeat superior*, agency, and/or other applicable law.

**JURISDICTION AND VENUE**

9. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, 42 U.S.C § 12117, 28 U.S.C. § 2000e-5, 29 U.S.C. § 2617, and 28 U.S.C. § 1331.

10. The unlawful employment practices described herein were committed within the State of Arizona, on Defendant's premises located in Maricopa County, State of Arizona.

11. Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).



**ALLEGATIONS COMMON TO ALL CLAIMS**

12. ABOR, through, *inter alia*, Dr. Ilori and Rachel Peterson hired Plaintiff through the University of Arizona beginning January 2018 as a Clinical Research Coordinator.

13. Plaintiff is a male.

14. ABOR originally interviewed Plaintiff for the "Senior" Clinic Research Coordinator position, but Dr. Ilori declined to offer Plaintiff that position.

15. However, almost immediately Defendants began requiring Plaintiff to fulfill the duties of a Senior Clinical Research Coordinator, but without the title and pay increase.

16. Upon information and belief, the reason Plaintiff was denied the "Senior" position was because of his sex.

17. Upon his hire, ABOR informed Plaintiff that he would be hired at a rate much less than he requested: $43,125.00 annually.

18. Plaintiff later learned that Defendants employed a female with the same title, with much less experience than Plaintiff, at $60,000.00 annually.

19. Continuously throughout his employment, Plaintiff's work performance was above and beyond what was expected, yet was constantly berated and treated disparately in comparison to his female colleagues.

20. For example, the primary duties of the job involved signing up patients at partner medical facilities for the University of Arizona's research project being funded by the National Institute of Health (NIH).

21. Plaintiff had an enrollment percentage higher than everyone else employed in Arizona in that role, and indeed one of the top percentages in the nation.

22. Plaintiff was not the only male employee treated disparately as other male employees, including managers, were harassed until they quit or were terminated – often after raising a discrimination or harassment claim.

23. Plaintiff's male colleagues confided in Plaintiff that a previous male Senior Clinical Research Coordinator was pushed out of his job due to similar treatment to Plaintiff.

24. Plaintiff specifically received inconsistent direction at the hands of Dr. Ilori, who



often gave him menial assignments to perform that she did not give to female employees.

25. On April 4, 2018, Plaintiff facilitated a meeting with Banner Chief Operating Officer to allow free office usage that more than tripled Defendant's office space. Dr. Ilori and another colleague failed to show up to the meeting and the offer fell through.

26. On May 8, 2018 Plaintiff landed the largest outpatient health center in Arizona as a partner at no cost to the program.

27. On May 21, 2018, a female supervisor gave the instruction that only the male clinical research coordinators would be journeying to the new site (which was 30 minutes further away).

28. Previously, the team had agreed harmoniously to handle the new site on a rotating basis.

29. Dr. Ilori frequently made comments or suggested that the male employees were "lazy" compared to the female employees – with no evidence to support those statements.

30. On June 10, 2018 Plaintiff reapplied for the Senior Clinical Research Coordinator position. At this point, Plaintiff had been working Senior duties since nearly his start date without additional compensation.

31. On June 10, 2018 Plaintiff emailed Dr. Ilori and a male colleague regarding a promotion.

32. On June 11, 2018 Plaintiff's male colleague copied Rachel Peterson on Plaintiff's request for a promotion.

33. After Ms. Peterson stepped in, she interviewed Plaintiff and approved his promotion.

34. Shortly thereafter, Dr. Ilori and another female colleague berated, verbally attacked Plaintiff, and embarrassed him in a meeting with his colleagues.

35. Plaintiff's male colleague reiterated that similar problems occurred with a previous male employee, who was ultimately forced out of his job.

36. On July 5, 2018, Dr. Holdsworth was contracted for the program by Dr. Ilori for the University of Arizona. She repeatedly told him he would be paid, but instructed Plaintiff and another male colleague to instruct him to continue work as if he was being paid and to "keep



making excuses."

37. Dr. Holdsworth reached out to Dr. Ilori numerous times for meetings, to which she never showed yet had Plaintiff attend the meetings without her and make excuses.

38. For months, Dr. Holdsworth was bringing participants and increasing numbers for the program to meet their quotas but was intentionally manipulated and lied to.

39. During a meeting, Dr. Ilori admitted to Plaintiff and his male manager that this was being done with multiple doctors.

40. On July 10, 2018, another former manager complained to Human Resources noting specifically the inappropriate treatment of Plaintiff, and particularly noting that other male staff have received the same disparate and hostile treatment.

41. On July 26, 2018 Dr. Ilori began having Plaintiff perform her secretarial work, not part of his job duties.

42. Upon information and belief, Dr. Ilori did this because of Plaintiff's association with the protected activity complaining to HR.

43. On August 17, 2018 Plaintiff received an offer letter for the Senior Clinical Research Coordinator position with a start date of September 10, 2018.

44. That same day, Human Resources declined Plaintiff's request for higher pay for the senior position, even with his previous experience.

45. Plaintiff's offer was lower than a female Clinical Research Coordinator. In fact, the average pay of a female Clinical Research Coordinator was $50,612.33 while Plaintiff (as a Senior CRC) was making $49,000.00 annually with more experience and with the higher "senior" position.

46. Upon information and belief, Dr. Ilori and/or Rachele Peterson had substantial input or influence on the salaries of Plaintiff and his female colleagues.

47. On September 18, 2018 Plaintiff landed the company a partnership with MD Anderson (a strong new source for possible enrollees). Three days later, he received a staff excellence award from his male supervisor.

48. In October 2018, Plaintiff again met with HR to discuss concerns about the



harassment and discrimination experienced by males in his department as reported by both Plaintiff and his male manager.

49. In early December 2018, Plaintiff was required to make a site visit to a Del Webb partner facility.

50. There he witnessed what he reasonably believed to be improper enrollment activity and violations of the procedures governing the grant funding the research project on which he was employed, including but not limited to:

   a. Enrollment of individuals in behavioral health who lacked the capacity to consent;
   b. Enrollment of individuals with late-stage Alzheimer's who lacked the capacity to consent;
   c. Breach of collection governing the program by Dr. Ilori who skipped blood draws and proceeded to saliva collections for genetics (a less preferred method) to save time and increase enrollment speed.

51. Plaintiff immediately reported those violations to hospital administration, to NIH itself, and to the U of A.

52. On December 12, 2018, the chief medical director of the program Dr. Akinlolu Ojo emailed Plaintiff's manager and directed him and Plaintiff specifically not to make any more reports to HR.

53. Upon information and belief, HR soon learned of this directive and failed to rescind it or notify Plaintiff that it was okay to talk to HR and make reports of discrimination or harassment as needed.

54. Also on December 12, 2018, Dr. Ilori held a meeting in which she accused Plaintiff (falsely) of sending inappropriate emails and underperforming at his job

55. Dr. Ilori attempted to get other co-workers to join her in that accusation. The co-workers refused to do so.

56. She instructed Plaintiff that he was not permitted to speak, and only listened to female co-workers during that meeting.

57. Plaintiff emailed his belief that he was being harassed and retaliated against to HR the next day.



58. In late December 2018, Plaintiff applied for a promotion for which he met all minimum and preferred qualifications and was denied.

59. Upon information and belief, the denial happened because of Plaintiff's protected activity.

60. Plaintiff was ultimately denied for three promotions; upon information and belief, Dr. Ilori was a primary reasons that Plaintiff did not receive a promotion.

61. In January 2019, Plaintiff learned that certain enrollment restrictions and distracting side assignments placed on the male employees by Dr. Ilori were not given to female employees.

62. In February 2019, Plaintiff received an "excelling" review by his male supervisor which was sent to HR, but later removed by Dr. Ilori or at her request or instruction.

63. Dr. Ilori terminated the male supervisor soon thereafter and became Plaintiff's direct supervisor.

64. On March 25, 2019, Dr. Ilori required Plaintiff to return to work after leaving for the day (making him late to pick up his 1 year old son) only to make him wait outside her office for 30 minutes until instructing him finally to come back the next day for a meeting.

65. On March 26, 2019, during the meeting, Dr. Ilori accused Plaintiff of being lazy and underperforming in front of the same HR representative as before.

66. Plaintiff produced his enrollment records showing his performance was almost three times that of at least one female employee (who was not disciplined for poor performance).

67. Dr. Ilori was clearly irritated that Plaintiff had proof of his good performance and said that his "actual" performance was irrelevant and that he needed to "look like" he was working harder to his female colleagues.

68. After the meeting, the HR representative set a 30-day follow up to discuss this "action plan" – though after Plaintiff made his report to the University's Office of Institutional Equity (OIE), she later claimed that it was not a "corrective" action.

69. Upon information and belief, the HR representative realized or was instructed that to punish Plaintiff with corrective action for making a complaint of harassment and discrimination would indeed be viewed as retaliation and changed the nature of the "action" as a result.



70. Plaintiff contacted HR and requested a meeting, though first notifying Dr. Ojo that he needed to contact HR despite Dr. Ojo's directive from December 2018.

71. In March 2019, Plaintiff met with HR to voice his discrimination and harassment claims as well as his concerns over the improper enrollment of patients who had not or could not legally consent to enrollment.

72. Plaintiff followed that meeting with a series of emails and requested protection from retaliation and mentioned going to the EEOC and the Office of Institutional Equity at U of A (the office tasked with upholding the institution's anti-harassment, anti-discrimination, and anti-retaliation policies).

73. HR directed him to the OEI for any concerns about retaliation at the University of Arizona and offered him no other assistance.

74. During that time frame, Dr. Ilori held another meeting with Plaintiff and his co-workers and accused him publicly (and falsely) of "taking" the female employees' administrative (i.e. non-enrollment) tasks.

75. Dr. Ilori reassigned Plaintiff's administrative tasks to his female colleagues "for their ability to promote."

76. Plaintiff's co-workers protested that Plaintiff chose last when it came to administrative tasks, giving them the first pick – but Dr. Ilori maintained her decision.

77. On April 12, 2019, Plaintiff received a new female supervisor, although it was someone who worked at a different site.

78. On April 23, 2019, Plaintiff filed his first EEOC charge alleging sex discrimination.

79. On May 1, 2019, Plaintiff met with his new supervisor at her request to disclose what had been happening to him during his employment.

80. She asked if he had considered applying to outside organizations and expressed her concerns about his mental state.

81. Plaintiff indeed was suffering tremendous emotional distress, for which he sought treatment through the relevant University department.

82. On May 8, 2019, Plaintiff requested emergency leave from HR under University



policies for his mental state.

83. HR denied the request but said he could request vacation time but it would be "unprotected leave."

84. That same day, Plaintiff's new supervisor instructed him not to talk to his co-workers about any meetings he was having with OIE to avoid "creating a hostile work environment" for them.

85. Plaintiff emailed HR on May 9, 2019 asking about FMLA leave.

86. On May 10, 2019, Plaintiff filed his second EEOC charge alleging additional sex discrimination, later amended to include retaliation.

87. On May 16, 2019, Plaintiff's work bag (but not the work computer or iPad inside the bag) containing his notes and details of harassment were mysteriously taken.

88. Thereafter Plaintiff was routinely required by his supervisors to document everything he did for work.

89. Plaintiff complied.

90. Plaintiff's co-workers were solicited by his supervisor for any damaging information they could share about Plaintiff.

91. Plaintiff was asked to create lists of "areas he could improve" – something he initially resisted as he expressed that this would come back to haunt him later.

92. He was assured these would not be used against him; but they were.

93. On June 3, 2019, Plaintiff emailed his supervisor about upcoming surgery requiring medical leave and asked whether he should use vacation or sick time.

94. On June 17, 2019, Defendants issued a request to modify Plaintiff's job and his job duties to a short-term (rather than annual) contract to end on September 16, 2019.

95. On June 17, 2019, Plaintiff's supervisor suddenly issued a corrective action plan threatening non-renewal of his contract pending "significant improvement." Plaintiff requested that HR be present for this meeting but the request was refused.

96. Upon information and belief this corrective action plan was done at the behest of or under the influence of Dr. Ilori and Ms. Peterson.



97. The "significant improvement" was vaguely defined and highly subjective.

98. On June 18, 2019, Plaintiff begins filling out documentation for ADA disability leave and asks for FMLA leave.

99. HR confirms that Plaintiff's "new" duties will not require the accommodation he is requesting.

100. Plaintiff's "new" assignment required fulfillment of a three-point project that Plaintiff had to do remotely.

101. On June 21, 2019, Plaintiff's supervisor turned off his computer access.

102. Plaintiff was then escorted from the facility by security in a public and humiliating fashion and his work computer taken away.

103. Plaintiff's co-workers were informed he was on "Medical leave."

104. Plaintiff's supervisor stated that she was aware of his FMLA request.

105. HR later gave Plaintiff impossible deadlines to return the FMLA paperwork.

106. Plaintiff offered several options and reasonable time-frames to provide the paperwork, all of which were refused by HR and ultimately his FMLA request was not approved.

107. On June 23, 2019, Plaintiff emailed the national head of the research program to disclose the enrollment problems he had previously reported.

108. On July 10, 2019, Plaintiff requested an "interactive process" with the University in writing, which was rejected.

109. In mid-July and again in early August, Plaintiff contacted HR and his newest supervisor Defendant Peterson about a second surgery to take place on August 8, 2019.

110. Plaintiff learned that on August 6, 2019, an email went out to all employees regarding an upcoming program-wide retreat.

111. Plaintiff asked Ms. Peterson why he had not received the invite and was informed that it was "not part of his assignment."

112. On September 9, 2019, Plaintiff emailed Ms. Peterson informing her of another scheduled surgery and follow-up physical therapy requirements to take place in late September or October.



113. He also asked her how to submit the completed work assignment, but received no response to that request.

114. On September 11, 2019, Ms. Peterson issues a "conclusion of appointment" memo, referencing both a notice of non-renewal of his annual contract and the termination of his short term assignment effective September 16, 2019.

115. She did not allow Plaintiff to submit his work assignment.

116. On September 13, 2019, Plaintiff submitted the work assignment via an old submittal link.

117. September 16, 2019 was Plaintiff's last day of employment.

118. Shortly thereafter, he received his final, discriminatory paycheck.

119. Upon information and belief, Defendants Ilori and Peterson made or substantially influenced the decision to terminate Plaintiff.

120. Upon information, Plaintiff's termination was actually caused by one or more of the following: his sex, his disability, his need for and anticipated use of FMLA leave, his accommodations requests, and/or his protected activity, i.e. his requests and communications with ABOR's human resources department and others regarding the treatment of himself, and the violations of the enrollment program guidelines.

121. Upon information and relief, the Defendants' justification for the termination is a complete pretext.

## ADMINISTRATIVE REMEDY EXHAUSTION

122. Plaintiff timely filed three charges of discrimination, with the EEOC, alleging violations of the ADA and Title VII. A true and correct copy of each charge is attached as Exhibit A.

123. The EEOC issued its Notices of Suit Rights for all three charges. True and correct copies of those Notice are attached as Exhibit B.

124. Plaintiff has filed suit within 90 days of his receipt of two of the Notices – as the third Notice was sent to Plaintiff's prior attorney who departed his firm, and involves retaliation connected to his previous charges of which the EEOC received written notice, Plaintiff should be



equitably allowed to proceed on all three charges.

125. All conditions precedent necessary to the filing of this lawsuit have been performed or have occurred.

### FIRST CAUSE OF ACTION – FMLA INTERFERENCE
### All Defendants

126. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

127. Plaintiff experienced a medical condition that placed Defendants on notice of his need for FMLA leave during his employment.

128. Defendants were aware of Plaintiff's need for leave.

129. Defendants terminated Plaintiff soon after his request for medical leave.

130. Plaintiff was not returned to his same or equivalent position.

131. It is unlawful for Defendants to interfere with or make any decision to terminate Plaintiff for exercising any rights under the FMLA.

132. Plaintiff's request for medical leave influenced Defendants' decision to terminate him.

133. Defendants' actions had the effect of interfering with Plaintiff's FMLA rights.

134. Defendants' actions in violating the FMLA were willful, unreasonable, and without good faith.

135. Thus, in addition to the amount of any lost compensation, benefits and other monetary damages owed, Plaintiff is entitled to recover from Defendants an additional equal amount as liquidated damages.

### SECOND CAUSE OF ACTION – FMLA RETALIATION
### All Defendants

136. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

137. Plaintiff began the process of applying for FMLA leave during his employment with Defendants for his own serious health condition.

138. Plaintiff engaged in protected activity regarding his FMLA rights, including but not limited to discussing with HR about the way his leave was handled and the negative reaction from



his supervisors.

139. It is unlawful for Defendants to make any decision regarding Plaintiff's employment for exercising his rights under the FMLA, including the right to report problems with the FMLA process.

140. The Defendants retaliated against Plaintiff for his protected activity by terminating his employment.

141. There was a causal connection between his protected activity under the FMLA, and Defendants' retaliation.

142. The Defendants' actions in violating the FMLA were willful, unreasonable, and without good faith.

143. Thus, in addition to the amount of any lost compensation, benefits and other monetary damages owed, Plaintiff is entitled to recover from the Defendants an additional equal amount as liquidated damages.

### THIRD CAUSE OF ACTION - ADA DISCRIMINATION
### ABOR only

144. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

145. Plaintiff's medical condition, as described above, caused substantial limitation to the performance of major life activities, and/or the perception by Defendant that Plaintiff experienced substantial limitations of major life activities.

146. Additionally, Plaintiff had a record of disability with Defendant.

147. Plaintiff's request for an accommodation placed Defendant on notice of a disability and contributed to the perception by Defendant that Plaintiff experienced substantial limitations of major life activities.

148. Plaintiff's request for an accommodation triggered Defendant's duty to engage in a reasonable interactive process regarding Plaintiff's need for an accommodation.

149. Defendant failed to engage Plaintiff reasonably in the interactive process required by the ADA to pursue a reasonable accommodation.

150. Defendant further failed to provide Plaintiff reasonable accommodation as



1  requested, despite the easy availability of such an accommodation.

151. Instead, Defendant terminated Plaintiff.

152. By these actions, Defendant has engaged in direct discrimination against Plaintiff, as well as treating him disparately from other non-disabled workers in violation of the ADA.

153. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of past and future lost wages and value of benefits, and other compensatory damages such as emotional distress causing physical symptoms.

### FOURTH CAUSE OF ACTION - ADA RETALIATION
### ABOR only

154. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

155. Plaintiff engaged in protected activity by reporting a perceived hostile work environment and various instances of discrimination and refusal to accommodate to Defendant's HR, the OIE and the EEOC.

156. Defendant has retaliated against Plaintiff for engaging in protected activity by taking several adverse actions as described herein in violation of the ADA.

157. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of past and future lost wages and value of benefits, and other compensatory damages such as emotional distress causing physical symptoms.

### FIFTH CAUSE OF ACTION - EQUAL PAY ACT DISCRIMINATION
### ABOR only

158. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

159. Defendant has employed Plaintiff and other female employees in jobs requiring equal (or in some cases) skill, effort, and responsibility.

160. Plaintiff and the female employees performed their jobs under similar working conditions.

161. Plaintiff was paid a lower wage than his female co-workers and similarly situated female colleagues performing substantially similar (or lesser) work.

162. The differential in pay between male and female employees was not due to a bona



fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor was the difference in pay a result of a factor other than sex.

163. Defendant willfully caused, contributed to, or caused the continuation of wage rate discrimination based on sex, in violation of the Equal Pay Act.

164. As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

165. Plaintiff seeks all injunctive, declaratory, and monetary relief available for equal pay violations at trial, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. § 216(b).

**SIXTH CAUSE OF ACTION – EQUAL PAY ACT RETALIATION**
**ABOR only**

166. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

167. Through his protected activity, Plaintiff has advised Defendant of its unlawful and discriminatory practices based on sex.

168. As a result of Plaintiff's complaints, Defendant's agents and employees took materially adverse actions against Plaintiff, including, but not limited to, reassigning his job duties, treating him with great hostility, and ultimately terminating him.

169. Defendant's adverse actions constituted retaliatory workplace harassment.

170. Defendant's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under 29 U.S.C. § 215(a)(3).

171. As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

172. Plaintiff seeks all injunctive, declaratory, and monetary relief available for equal pay violations at trial, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. § 216(b).

**SEVENTH CAUSE OF ACTION - TITLE VII SEX-BASED DISCRIMINATION**
**ABOR only**



173. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

174. Plaintiff is a member of a protected group: male.

175. Defendant has violated Title VII by engaging in direct discrimination and disparate treatment of Plaintiff because of his sex.

176. Additionally, Defendant has violated Title VII by creating and fostering a pervasive hostile work environment that altered the terms and conditions of Plaintiff's employment and was abusive.

177. The disparate treatment, and hostile environment were un-welcomed by the Plaintiff.

178. As a result of the foregoing, Defendant is liable to Plaintiff for violation of Title VII.

179. Defendant's acts of discrimination in this regard were unlawful and intentional.

180. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of severe emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

181. Plaintiff suffered and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices until this Court grants relief.

## COUNT EIGHT - TITLE VII RETALIATION
### ABOR only

182. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

183. Plaintiff engaged in several protected activities, including by reporting a perceived discriminatory environment to Defendant's HR and Ethics Hotline.

184. Defendant has retaliated against Plaintiff for engaging in protected activity by taking several adverse actions as described herein, in violation of Title VII.

185. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

186. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices until this Court grants relief.



## COUNT NINE - 42 U.S.C § 1983 (FIRST AMENDMENT)
### Individual Defendants Only

187. By reference hereto, Plaintiff hereby incorporates the preceding paragraphs.

188. Defendants Dr. Ilori and Ms. Peterson were both supervisory-level administrators, as more fully described above, at the University of Arizona, a state university.

189. Thus, Defendants were acting under color of law.

190. Plaintiff's right to oppose improper enrollment and violations of the procedures of the federally-funded grant racial discrimination and to not be retaliated against for speaking about such opposition are protected by the First Amendment to the United States Constitution.

191. Plaintiff engaged in free speech when, among other things, he reported the improper activity and violations to the hospital administration, NIH, and to U of A's human resources department.

192. Plaintiff's speech was regarding a matter of public concern, and Plaintiff's interest in commenting on the matter outweighed any of the Defendants' interests.

193. As a result of Plaintiff's protected First Amendment speech, Defendants retaliated and discriminated against Plaintiff in that Plaintiff was stripped of many of his job duties, humiliated by removal by security from a partner site, and ultimately terminated.

194. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, loss of reputation, and loss of self-esteem.

195. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' actions until this Court grants relief.

196. Plaintiff also seeks punitive damages as Defendants' actions were motivated by evil motive or intent, and/or reckless or callous indifference to the federally protected rights of others

### JURY TRIAL DEMANDED

197. Plaintiff demands a trial by jury.



**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

A. Declaring that the acts and practices complained of herein are in violation of federal law;

B. Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment or employment opportunities;

C. Directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' unlawful actions, and make him whole for all earnings he would have received but for Defendant's unlawful actions, including, but not limited to, back pay, front pay, tuition reimbursement, and other lost benefits;

D. Awarding Plaintiff compensatory damages in amounts to be determined by the jury;

E. Awarding liquidated damages for Defendants' actions taken without good faith;

F. Awarding Plaintiff pre- and post-judgment interest, the costs of this action, and reasonable attorneys' fees as provided by the statutes providing the causes of action cited herein; and

G. Granting such other and further relief as this Court deems necessary and proper.

Respectfully submitted on this 15th day of September, 2021,

CARDEN LIVESAY, LTD.

By: s/Joshua W. Carden
Joshua W. Carden
*Attorney for Plaintiff*
Ian Gage

